**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| PAMELA HOLDEN, *et al.* | * | |
| Plaintiffs, | * | |
| v. | * | Civil No.: BPG-19-760 |
| BWELL HEALTHCARE, INC., *et al.* | * | |
| Defendants | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## <u>MEMORANDUM OPINION</u>

The above-referenced case was referred to the undersigned for all proceedings with the consent of the parties, pursuant to 28 U.S.C. 636(c) and Local Rule 301.4.  (ECF Nos. 59, 60). Currently pending are plaintiffs' Motion for Partial Summary Judgment Against Defendants Bwell Healthcare, Inc. and Femmy Kuti ("plaintiffs' Motion") (ECF No. 70), defendants' Cross Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Partial Summary Judgment ("defendants' Cross Motion") (ECF No. 75), plaintiffs' Opposition to Defendants' Cross Motion for Summary Judgment and Reply in Support of Plaintiffs' Motion for Partial Summary Judgment ("plaintiffs' Response and Reply") (ECF No. 77), defendants' Reply to Plaintiffs' Opposition to Defendants' Cross Motion for Summary Judgment ("defendants' Reply") (ECF No. 78), and defendants' Supplemental to Defendants' Reply to Plaintiffs' Opposition to Defendants' Cross Motion for Summary Judgment ("defendants' supplemental briefing") (ECF No. 79).  No hearing is deemed necessary. Loc. R. 105.6.  For the reasons discussed herein, plaintiffs' Motion for Partial Summary Judgment (ECF No. 70) is granted in part and denied in part, and defendants' Cross Motion for Summary Judgment (ECF No. 75) is denied.

## I.    **BACKGROUND**

In ruling on a motion for summary judgment, this court considers the facts and draws all reasonable inferences in the light most favorable to the nonmoving party.  Scott v. Harris, 550 U.S. 372, 378 (2007).   When the parties have filed cross motions for summary judgment, in "considering each individual motion, the court must take care to 'resolve all factual disputes and any competing, rational inferences in the light most favorable' to the party opposing that motion." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (quoting Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996)).  Defendant Bwell Healthcare, Inc. ("Bwell") is a state-licensed residential service agency that coordinates with Maryland's Department of Health to provide homecare assistance to individuals enrolled in Maryland state Medicaid programs.  (ECF No. 75-1 at 6).  Defendant Femmy Kuti ("Mr. Kuti") is Bwell's director of operations.  (ECF No. 70-3 at 33).  Plaintiffs Pamela Holden, April Wright, and Stephanie Williams ("plaintiffs") were hired by Mr. Kuti (ECF No. 70-7 at 4) and worked for Bwell as homecare aides.[1]  Ms. Holden worked for Bwell from approximately 2012 through September 2019 and Ms. Wright worked for Bwell from January 2016 through February 2017.  (ECF No. 70-1 at 12).  Ms. Williams began working for Bwell in March 2016 and remained employed by Bwell as of the time of the filing of plaintiffs' Motion, although she was briefly terminated in July 2019 and reinstated shortly thereafter.  (Id.)  While working for Bwell, plaintiffs were classified as independent contractors and paid $11 per hour.  (ECF No. 75-1 at 8, 10).  Defendants, however, note that Bwell recently increased the pay for their homecare aides to $11.50 per hour.  (Id. at 11).

---

[1] Defendants refer to plaintiffs' positions as "personal care providers" (ECF No. 75-1 at 7) or "personal care attendants" (ECF No. 70-3 at 101).

On March 12, 2019, Ms. Holden and Ms. Wright filed their Complaint against defendants, alleging violations of the Fair Labor Standards Act ("FLSA"), the Maryland Wage and Hour Law ("MWHL"), and the Maryland Wage Payment and Collection Law ("MWPCL").  (ECF No. 1). Ms. Williams was not a party to the lawsuit at the time of the Complaint.  In a letter addressed to Ms. Holden dated July 5, 2019, Mr. Kuti noted his intent to terminate Ms. Holden based on defendants' belief that Ms. Holden was a "disgruntled and dissatisfied employee with tendencies to be a saboteur."  (ECF No. 11-3 at 5).  In another letter addressed to Ms. Williams dated July 9, 2019, Mr. Kuti informed Ms. Williams of a "suspension of relationship," noting that Ms. Williams would no longer be assigned to provide direct care services because she was "a disgruntled employee with a poor attitude" who "harass[ed] and disrespect[ed] our Administrators, [and] us[ed] vulgar/abusive language towards them . . . ."  (ECF No. 11-4 at 5).  On July 15, 2019, plaintiffs filed their amended Complaint against defendants in which Ms. Williams was added as a plaintiff only as to the plaintiffs' retaliation claim.  (ECF No. 14).

Plaintiffs moved for partial summary judgment on March 8, 2021, arguing that (1) plaintiffs were employees under the FLSA, MWHL, and MWPCL, (2) defendants failed to pay Ms. Holden and Ms. Wright required wages for travel time and overtime, (3) Ms. Holden and Ms. Wright are entitled to liquidated damages for defendants' alleged violations under the FLSA and MWHL, (4) Ms. Holden and Ms. Wright are eligible for treble damages for defendants' alleged violations under the MWPCL, (5) defendants violated the FLSA's anti-retaliation provisions by terminating Ms. Holden and Ms. Williams, and (6) Mr. Kuti is individually liable as plaintiffs' employer.  (ECF No. 70-1 at 18-34).  Defendants moved for summary judgment on March 29, 2021, opposing plaintiffs' position as to all six issues discussed above.  (ECF No. 75-1 at 18-29).

## II.   <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A fact is properly considered "material" only if it might affect the outcome of the case under the governing law. <u>Id.</u> The party moving for summary judgment has the burden of demonstrating the absence of any genuine issue of material fact. Fed. R. Civ. P. 56(a); <u>Pulliam Inv. Co., Inc. v. Cameo Props.</u>, 810 F.2d 1282, 1286 (4th Cir. 1987). On those issues for which the non-moving party will have the burden of proof, however, it is his or her responsibility to oppose the motion for summary judgment with affidavits or other admissible evidence specified in Federal Rule of Civil Procedure 56. Fed. R. Civ. P. 56(c); <u>Mitchell v. Data Gen. Corp.</u>, 12 F.3d 1310, 1315-16 (4th Cir. 1993). If a party fails to make a showing sufficient to establish the existence of an essential element on which that party will bear the burden of proof at trial, summary judgment is proper. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).

When reviewing a motion for summary judgment, the court does not evaluate whether the evidence favors the moving or non-moving party, but considers whether a fair-minded jury could return a verdict for the non-moving party on the evidence presented. <u>Anderson</u>, 477 U.S. at 252. In undertaking this inquiry, the court views all facts and makes all reasonable inferences in the light most favorable to the non-moving party. <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). The non-moving party, however, may not rest on its pleadings, but must show that specific, material facts exist to create a genuine, triable issue. <u>Celotex</u>, 477 U.S. at 324. A "scintilla" of evidence in favor of the non-moving party, however, is insufficient

to prevent an award of summary judgment.  <u>Anderson</u>, 477 U.S. at 252.  Further, "mere speculation" by the non-moving party or the "building of one inference upon another" cannot create a genuine issue of material fact.  <u>Cox v. Cnty. of Prince William</u>, 249 F.3d 295, 299-300 (4th Cir. 2001).  Summary judgment should be denied only where a court concludes that a reasonable jury could find in favor of the non-moving party.  <u>Anderson</u>, 477 U.S. at 252.  Where, as here, the parties file cross motions for summary judgment, "[t]he court must rule on each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard."  <u>Towne Mgmt. Corp. v. Hartford Acc. and Indem. Co.</u>, 627 F. Supp. 170, 171 (D. Md. 1985).

## III.   <u>DISCUSSION</u>

### A.   <u>Status of Plaintiffs Under the FLSA, MWHL, and MWPCL</u>

Plaintiffs first argue that they were employees of defendants under the FLSA, MWHL, and MWPCL.  (ECF No. 70-1 at 18).  Defendants contend that plaintiffs were independent contractors and, therefore, the FLSA, MWHL, and MWPCL do not apply to them.  (ECF No. 75-1 at 18).  The FLSA defines an employee as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). The term "employ" means "to suffer or permit to work."  <u>Id.</u> at § 203(g).  The definition of employee is to be construed broadly in light of the remedial nature of the FLSA.  <u>McFeeley v. Jackson Street Ent., LLC</u>, 825 F.2d 235, 240 (4th Cir. 2016).  "To determine whether a worker is an employee under the FLSA, courts look to the 'economic realities' of the relationship between the worker and the putative employer."  <u>Id.</u> at 241 (citing <u>Schultz v. Capital Intern. Sec., Inc.</u>, 466 F.3d 298, 304 (4th Cir. 2006)).  The court must focus on whether the worker "is economically dependent on the business to which he renders service or is, as a matter of economic [reality], in business for himself."  <u>Id.</u>  In doing so, the court considers six factors: "(1) the degree of control

that the putative employer has over the manner in which the work is performed; (2) the worker's opportunities for profit or loss dependent on his managerial skill; (3) the worker's investment in equipment or material, or his employment of other workers; (4) the degree of skill required for the work; (5) the permanence of the working relationship; and (6) the degree to which the services rendered are an integral part of the putative employer's business." Id. ("the Schultz factors"). "No single factor is dispositive." Shultz, 466 F.3d at 305. Rather, the court must look to the totality of the circumstances to determine the economic reality of the relationship between the worker and the putative employer. Braxton v. Eldorado Lounge, Inc., No. ELH-15-3661, 2017 WL 4865476, at *6 (D. Md. Oct. 27, 2017) (citing McFeeley, 825 F.3d at 240-41).

### 1. Degree of Control

Plaintiffs argue that defendants maintained a high degree of control because they required plaintiffs to comply with their "Employee Rights/Responsibilities" policies, subjected plaintiffs to disciplinary measures, barred plaintiffs from transporting Bwell's clients and family members of clients, set weekly hours and wage rates, and required plaintiffs to maintain check lists of their daily tasks and use a specific timekeeping system to monitor their work. (ECF Nos. 70-1 at 21, 77 at 8-10). Defendants, however, contend that they held minimum control over the manner in which plaintiffs performed their work. (ECF No. 75-1 at 19). Defendants assert that the nature of the homecare industry is such that *some* control over plaintiffs was necessary so that the state Medicaid program could work efficiently but that, in any event, the degree of defendants' control was minimal. (Id. at 20).

There is clearly evidence in the record, however, indicating that defendants had significant control over the manner in which plaintiffs performed their work. Defendants set plaintiffs' hourly pay (ECF No. 70-9), required plaintiffs to maintain daily check lists of completed tasks (ECF No.

70-3 at 182-90), mandated use of a timekeeping system for plaintiffs to monitor their work (ECF No. 70-17), required plaintiffs to make evaluation notes and maintain visit documentation pertaining to their clients (id.), fixed the number of weekly work hours (id.), subjected plaintiffs to disciplinary measures (ECF No. 70-14 at 1), barred plaintiffs from transporting clients and their family members (ECF No. 70-12), and required plaintiffs to comply with other specific company policies (ECF No. 70-14).  Defendants further argue that their control over plaintiffs was minimal because many of the requirements and policies discussed above were imposed pursuant to applicable state Medicaid regulations, not unilaterally by Bwell.  (Id. at 20-21).  As plaintiffs note, however, when policies are imposed pursuant to state regulations, the worker remains, as a matter of economic reality, economically dependent on the business to which he renders service.  See Acosta v. At Home Pers. Care Servs. LLC, et al., No. 1:18-cv-549 (LMB/IDD), 2019 WL 1601997, at *8-9 (E.D. Va. Apr. 15, 2019) (granting summary judgment for plaintiffs on the question of whether plaintiffs were employees under the FLSA when plaintiffs "were subject to discipline if they failed to perform the services in accordance with the company's rules and with applicable Medicare and Medicaid regulations").  The court concludes, therefore, that defendants held significant control over the manner in which plaintiffs performed their work.  Accordingly, this factor weighs in favor of employee status.

## 2. Opportunity for Profit or Loss

Plaintiffs argue that they had no opportunities for profit or loss because they "worked the hours Defendants assigned them at an hourly rate Defendants paid them on a 'take-it-or-leave-it' basis."  (ECF No. 70-1 at 22).  Defendants oppose plaintiffs' position, maintaining that plaintiffs had opportunities for profit or loss because they could solicit clients on their own in addition to those assigned by Bwell.  (ECF No. 75-1 at 21-22).  The Fourth Circuit, however, "has clearly

distinguished between the managerial skill associated with profit and loss and 'simply good salesmanship.'" Braxton, 2017 WL 4865476, at *7 (citing McFeeley, 825 F.3d at 243) ("It is natural for an employee to do his part in drumming up business for his employer, especially if the employee's earnings depend on it."); see also Acosta, 2019 WL 1601997, at *2 (holding that the plaintiff personal care aides were low-skilled workers who had no opportunities for profit or loss dependent on their managerial skill because they worked alone and had little bargaining power). Further, defendants in this case fixed plaintiffs' hourly pay rate at $11.00 per hour, a "key determinant . . . affecting plaintiffs' ability to make a profit." McFeeley, 825 F.3d at 243 (internal quotation marks omitted).[2]  The court concludes, therefore, that plaintiffs had no opportunities for profit or loss dependent on their managerial skill.  Accordingly, this factor weighs in favor of employee status.

### 3. Investment in Equipment or Material

Plaintiffs contend that they did not invest in any equipment or material and were prohibited from employing other workers.  (ECF No. 70-1 at 23).  While defendants acknowledge that plaintiffs did not invest in any equipment or material, they noted that plaintiffs acquired their own uniforms for work.  (ECF No. 75-1 at 22).  Workers, however, do not become independent contractors merely because they invest in their own clothing.  See McFeeley, 825 F.3d at 243 (holding that plaintiffs who invested in their own apparel in addition to making other occasional contributions to the workplace were employees under the FLSA).  Further, as plaintiffs note,

---

[2] In addition, defendants contend that Ms. Holden "was able to negotiate and object regarding the rate that she would be paid."  (ECF No. 75-1 at 22).  As plaintiffs note, however, there is no evidence in the record indicating that Ms. Holden was able to negotiate her pay.  (ECF No. 77 at 12 n.20).  Instead, plaintiffs accurately note that "Ms. Holden testified that the information on her 'independent contractor agreement' was wrong because she was paid $8 per hour and not the $17 per visit, as the document stated, so she asked [Mr.] Kuti to fix it—she never testified that she negotiated her pay with anyone at Bwell."  (Id.)

defendants prohibited plaintiffs from hiring others to work in their place, suggesting employee status.  See Acosta, 2019 WL 1601997, at *8 (holding that the plaintiff personal care aides were employees in part because they were not allowed to hire others).  Accordingly, this factor weighs in favor of employee status.

### 4. Degree of Skill Required

Homecare aides are considered low-skilled workers, although the court "does not doubt the expertise or discretion required to render personal care services."  Id.  Plaintiffs and defendants agree that plaintiffs were only required to be certified in CPR and first aid to be qualified to work for Bwell.  (ECF Nos. 70-1 at 23, 75-1 at 22).  The minimal degree of skill required for plaintiffs' work, therefore, supports an employee classification.

### 5. Permanence of the Working Relationship

Plaintiffs maintain that defendants "subjected Plaintiffs to a multi-step employment application process, and interviewed, hired, and employed them on an indefinite, permanent basis." (ECF No. 70-1 at 24).  Defendants, however, argue that they do not have a permanent working relationship with plaintiffs because many workers "come on a temporary basis and go as soon as their assignments end," which occurs when a client dies or the state terminates a client's services. (ECF No. 75-1 at 23).  As to the plaintiffs in this case, however, Ms. Holden worked for defendants for more than six years and Ms. Wright worked for defendants for more than one year, suggesting they had an "at will" employment relationship with defendants, thus supporting an employee classification.  Montoya v. S.C.C.P. Painting Contractors, Inc., 589 F. Supp. 2d 569, 581 (D. Md. 2008) (holding in favor of employee status when plaintiffs worked full-time for a single employer at multiple job sites for extended periods of time).  In addition, although plaintiffs served different clients, plaintiffs "did not work in the temporary, project-related capacity typically associated with

independent contracting." <u>Acosta</u>, 2019 WL 1601997, at *8.  Accordingly, this factor weighs in favor of employee status.[3]

### 6. Integral Nature of Services Provided

Plaintiffs contend that their work was integral to defendants' business because plaintiffs' services constituted the entirety of Bwell's business.  (ECF No. 70-1 at 24).  Defendants argue that the services rendered by plaintiffs were not integral to defendants' business because plaintiffs provided care to clients in their homes whereas defendants acted as a staffing agency that merely introduced homecare workers to clients.  (ECF No. 75-1 at 23).  Defendants make a distinction without a difference.  Without homecare workers like plaintiffs, Bwell could not function as a staffing agency for homecare services.  <u>See</u> <u>Acosta</u>, 2019 WL 1601997, at *8 (holding that the plaintiff homecare workers provided services that were integral to the business of the defendant, a provider of homecare services to individuals enrolled in Medicare or Medicaid).  <u>See also</u> <u>McFeeley</u>, 835 F.3d at 244 (noting that the defendant exotic dance clubs could not function without exotic dancers).  In addition, Bwell advertises itself on its website as a "residential service agency (RSA) providing complex skilled nursing services . . . with supervision of Aides . . . ."  (ECF No. 5-6 at 2).  The court concludes, therefore, that plaintiffs' work was integral to defendants' business. Accordingly, this factor weighs in favor of employee status.

---

[3] Defendants further note that Ms. Holden recruited most of her clients herself and that Bwell assigned only one client to Ms. Holden during the course of their working relationship.  (ECF No. 75-1 at 23).  The source of Ms. Holden's clients, however, does not change the reality of Ms. Holden's working relationship with defendants, who maintained control over Ms. Holden's compensation structure (ECF No. 70-3 at 149) and determined workplace policies with which Ms. Holden was required to comply (ECF No. 70-14) regardless of how Ms. Holden obtained her clients.  In addition, defendants note that Ms. Wright worked for Bwell for a "very short period of time," thus supporting an independent contractor classification.  (<u>Id.</u>)  The evidence in the record, however, indicates otherwise.  As discussed above, and as plaintiffs note, Ms. Wright worked for defendants for more than a year.  (ECF No. 77 at 14-15).

### 7. Consideration of All Factors

In sum, the court finds that defendants held significant control over the manner in which plaintiffs performed their work and plaintiffs had no opportunities for profit or loss, did not invest in any equipment or material and were forbidden from employing other workers, had a permanent working relationship with defendants, and performed work that was integral to defendants' business.  Based on a balancing of the six <u>Schultz</u> factors, the court concludes that there is no genuine dispute as to whether plaintiffs were employees under the FLSA.  Accordingly, plaintiffs' Motion is granted, and defendants' Cross Motion is denied on the issue of whether plaintiffs were employees under the FLSA.

The court also applies the <u>Schultz</u> factors in determining whether plaintiffs were employees under the MWHL.  <u>Braxton v. Eldorado Lounge, Inc.</u>, No. ELH-15-3661, 2017 WL 4865476, at *6 (D. Md. Oct. 27, 2017).  In light of the court's ruling that plaintiffs were employees of defendants under the FLSA, therefore, the undersigned will also grant plaintiffs' Motion and deny defendants' Cross Motion on the question of whether plaintiffs were employees of defendants under the MWHL.  <u>See id.</u> at *9 (noting that the MWHL is the state parallel of the FLSA and the same "economic realities" test applies in determining the employment relationship under the FLSA and the MWHL).

With respect to whether plaintiffs were employees under the MWPCL, plaintiffs rely on <u>Ramirez v. 316 Charles, LLC</u>, 2020 U.S. Dist. LEXIS 237015, at *9-10 (D. Md. Dec. 16, 2020) for the proposition that "[t]he elements under the . . . MWPCL are the same as those of the FLSA." (ECF No. 70-1 at 19).  The elements discussed in <u>Ramirez</u>, however, are different than the six factors used by this court to determine whether a plaintiff is an employee under the FLSA and the

MWHL.[4]  In addition, the factors to be considered in determining whether a person is an employee under the MWPCL may not be the same as the <u>Schultz</u> factors.  <u>See</u> <u>Braxton</u>, 2017 WL 4865476, at *9 (citing <u>Jones v. Hoffberger Moving Servs. LLC</u>, 92 F. Supp. 3d 405, 411 n.3 (D. Md. 2015) (noting that that MWPCL may not be "perfectly aligned with the FLSA"); <u>Horlick v. Capital Women's Care, LLC</u>, 896 F. Supp. 2d 378, 388 (D. Md. 2011) (citing different factors)).  While the factors used to determine whether a worker is an employee under the MWPCL may vary, it is clear that the economic reality test applies.  <u>Cf.</u> <u>Gharib v. Journal of Comm. on Pol. Econ. of the Good Society, et al.</u>, No. GJH-17-3476, 2018 WL 4679954, at *5 (D. Md. Sept. 27, 2018) (applying the same economic reality test under the FLSA and the MWPCL); <u>Mazariegos, et al. v. Pan 4 Am., LLC, et al.</u>, No. DLB-20-2275, 2021 WL 4339434, at *2 n.1 (D. Md. Sept. 23, 2021) (holding that the economic reality test guides the analysis under both the FLSA and the MWPCL).[5] In light of the court's ruling above that plaintiffs were employees of defendants under the FLSA, therefore, the undersigned concludes that plaintiffs were also employees under the MWPCL. Accordingly, plaintiffs' Motion is granted, and defendants' Cross Motion is denied on this issue.

Defendants further argue that plaintiffs are exempt from FLSA protection because (1) plaintiffs were not engaged in commerce as defined by 29 U.S.C. § 207(a)(1) and (2) plaintiffs were employed to provide companionship services pursuant to 20 U.S.C. § 213(a)(15).  (ECF No.

---

[4] The elements in <u>Ramirez</u> and to which plaintiffs refer relate specifically to claims for unpaid overtime wages, not to the question of whether a worker is an employee or an independent contractor.  <u>Ramirez</u>, 2020 U.S. Dist. LEXIS 237015, at *9-10 (noting that to prove a claim for unpaid overtime wages under the FLSA, MWHL, and MWPCL, a plaintiff must show (1) employment by the defendant during the relevant time, (2) qualification as an employee under the statute, and (3) the defendant's failure to pay overtime).

[5] Most of the applicable case law focuses on whether a defendant is an employer under the MWPCL given that the statute is focused on the employer's obligations.  Nonetheless, the court is satisfied that the economic reality test used to address plaintiffs' claims under the FLSA also applies to plaintiffs' claims under the MWPCL to determine whether a plaintiff is an employee.

75-1 at 24-25).  An employee is covered by the FLSA when he is "engaged in commerce or in the production of goods for commerce."  29 U.S.C. § 207(a)(1).  As plaintiffs note, Congress has already determined that "the employment of persons in domestic service in households affects commerce."  29 U.S.C. § 202(a); see also Carmack v. Park Cities Healthcare, LLC, 321 F. Supp. 3d 689, 698-99 (N.D. Tex. 2018) (holding that homecare employees who worked in the private homes of their clients were engaged in commerce and thus covered by the FLSA).  The court concludes, therefore, that plaintiffs are engaged in commerce for purposes of the FLSA.

In addition, the court finds defendants' second argument with respect to companionship services unpersuasive.  The FLSA exempts "any employee employed in domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves."  29 U.S.C. § 213(a)(15).  As plaintiffs note, however, defendants in this case may not claim this exemption because defendants are third party employers of plaintiffs.  See 29 C.F.R. § 552.109(a) ("Third party employers of employees engaged in companionship services . . . may not avail themselves of the minimum wage and overtime exemption provided by section 13(a)(15) of the Act . . . .").  Accordingly, the court concludes that plaintiffs are covered by the FLSA.

### B.  Overtime and Travel Time

Plaintiffs argue that defendants failed to compensate Ms. Holden and Ms. Wright for overtime.  (ECF No. 70-1 at 24-26).  Defendants do not dispute that Ms. Holden and Ms. Wright were entitled to overtime if they were employees under the FLSA. [6]  (ECF No. 75-21 at ¶ 19).

---

[6] Mr. Kuti acknowledges that based upon his review of payroll records, "Ms. Holden would have been paid overtime of $1535.89 in 2016, $455.93 in 2017, $909.11 in 2018 and $787.00 in 2019, if she was qualified as an employee and is entitled to overtime.  Similarly, Ms. Wright would have received only $51.94 in 2016 is [sic] she was qualified as an employee and entitled to overtime." (ECF No. 75-21 at ¶ 19).

Instead, defendants argue that plaintiffs' calculations regarding the amount of overtime pay are incorrect. (ECF No. 75-1 at 28). "The FLSA requires that, when working more than forty hours in a workweek, a covered employee must receive compensation 'at a rate not less than one and one-half times the regular rate at which he [or she] is employed.'" Acosta v. Mezcal, Inc., No. JKB-17-0931, 2019 WL 2550660, at *5 (D. Md. June 20, 2019) (citing 29 U.S.C. § 207(a)(1)). An employee's 'regular rate' is "the hourly rate that the employer pays the employee for the normal, nonovertime forty-hour workweek." Flood v. New Hanover Cnty., 125 F.3d 249, 251 (4th Cir. 1997). "If employees were paid the regular rate for all hours, the back pay owed is '50% of the regular rate for the overtime hours worked.'" Acosta, 2019 WL 2550660, at *5. In this case, in light of the court's ruling above that plaintiffs are employees under the FLSA, the court concludes that Ms. Holden and Ms. Wright are entitled to overtime pay "at a rate not less than one and one-half times the regular rate." See id. Defendants paid Ms. Holden and Ms. Wright a regular rate of $11.00 per hour even when Ms. Holden and Ms. Wright worked more than 40 hours in a workweek. (ECF Nos. 70-8 at 93, 70-9, 70-13 at 52, 75-21 at ¶ 19).[7] The court further concludes, therefore, that Ms. Holden and Ms. Wright are entitled to $5.50 per hour (i.e., 50 percent of the regular rate of $11.00) for any hours worked beyond 40 hours in a given workweek during the relevant time period. See Acosta, 2019 WL 2550660, at *5.

Specifically, plaintiffs contend that Ms. Holden is owed $9,681.47 in overtime pay and Ms. Wright is owed $174.81 in overtime pay based on calculations made by Lena Yeakey, a paralegal for plaintiffs' counsel. (ECF No. 70-23). Defendants, however, argue that plaintiffs' calculations

---

[7] In addition, Mr. Kuti acknowledged during his deposition that $11.00 was the hourly rate for personal care attendants until, sometime after plaintiffs filed their Complaint in this case, defendants increased the pay for personal care attendants to $11.50 per hour. (ECF Nos. 70-3 at 360-61, 75-1 at 11). Defendants, however, provide no evidence that plaintiffs were paid more than $11.00 per hour for any hours worked during the relevant time period.

are incorrect and assert different overtime amounts based on Mr. Kuti's review of certain ISAS reports.  (ECF No. 75-21 at ¶ 19).  The court concludes, therefore, that a factual dispute exists as to the amount of overtime pay owed to Ms. Holden and Ms. Wright.  Accordingly, plaintiffs' Motion is denied, and defendants' Cross Motion is denied as to the amount of overtime pay owed to Ms. Holden and Ms. Wright.

In addition, plaintiffs argue that defendants failed to compensate Ms. Holden and Ms. Wright at any rate (i.e., neither straight time[8] nor overtime) for time spent traveling from one client's home to another during the workday.  (ECF No. 70-1 at 24-26).  Defendants, however, contend that plaintiffs are not entitled to payment for travel time because plaintiffs "did not maintain any record regarding travels" and the amounts claimed by plaintiffs are "speculative." (ECF No. 75-1 at 26).  FLSA regulations provide that "[t]ime spent by an employee in travel as part of his principal activity, such as travel from job site to job site during the workday, must be counted as hours worked."  29 C.F.R. § 785.38; see also U.S. Department of Labor ("DOL"), Wage and Hour Division, Minimum Wage and Overtime Pay for Direct Care Workers: Travel Time, https://www.dol.gov/agencies/whd/direct-care/travel-time (last visited Nov. 22, 2021) (noting that travel between several clients during the workday is compensable hours worked).  In this case, plaintiffs contend that Ms. Holden is owed $3,029.95 in straight travel time pay and $1,454.36 in overtime travel time pay.  (ECF No. 70-23 at 3).  Plaintiffs also maintain that Ms. Wright is owed $148.06 in straight travel time pay and $51.36 in overtime travel time pay.  Specifically, plaintiffs assert that they calculated these amounts based on Ms. Holden's and Ms. Wright's clock-in and clock-out times as noted in defendants' ISAS records.  (Id. at 2-3).  Plaintiffs, however, fail to

---

[8] As plaintiffs note, "straight time" refers to unpaid compensable work time when plaintiffs did not work more than 40 hours in a week.  (ECF No. 70-23 at 2).

provide evidence indicating that the time in between when Ms. Holden and Ms. White would clock out of one job and clock in for another job was solely compensable travel time.  Instead, plaintiffs assert in a conclusory manner that the time in between each clock-out and clock-in time is compensable travel time.  (Id.)  Defendants refute plaintiffs' calculations, asserting that the amounts claimed by plaintiffs are "speculative" and that plaintiffs failed to maintain any record of their travel time.  (ECF No. 75-1 at 26).  The factual premise to plaintiffs' overtime claims (i.e., all time less than 90 minutes[9] between clock-out and clock-in times constitutes travel time) is wholly dependent upon plaintiffs' testimony and the jury's evaluation of that testimony.  As a result, factual disputes exist as to the amount of compensable travel time, if any, and, therefore, summary judgment is not appropriate with respect to the amount of travel time pay owed to Ms. Holden and Ms. Wright.  Accordingly, plaintiffs' Motion is denied, and defendants' Cross Motion is denied on this issue.

### C. Liquidated Damages

Next, plaintiffs contend that they are entitled to liquidated damages pursuant to the FLSA and the MWHL because defendants knew about the FLSA's overtime requirement and sought to avoid it by classifying plaintiffs as independent contractors.  (ECF No. 70-1 at 27).  Defendants oppose plaintiffs' position, arguing that defendants acted in good faith in classifying plaintiffs as independent contractors based on Mr. Kuti's research of industry standards, consideration of other residential service agencies as models, advice from a lawyer, and meetings with state officials, among other reasons.  (ECF No. 75-1 at 25-26).  An employer who fails to pay wages required by the FLSA or MWHL is liable for liquidated damages in an amount equal to the unpaid wages.

---

[9] The court notes that plaintiffs arbitrarily excluded purported travel time that exceeded 90 minutes. (ECF No. 70-23 at 3).

Diaz v. Mi Mariachi Latin Rest., Inc., No. GJH-18-636, 2019 WL 528185, at *2 (D. Md. Feb. 11, 2019) (citing 29 U.S.C. § 216(b); Md. Code Ann., Lab. & Empl., § 3-247).  "Liquidated damages for overtime violations are the norm."  Sanchez Careera v. EMD Sales, Inc., 402 F. Supp. 3d 128, 149 (D. Md. 2019) (citing Mayhew v. Wells, 125 F.3d 216, 220 (4th Cir. 1997) (internal quotation marks omitted).  "However, courts have discretion under the FLSA to decline to award liquidated damages 'if the employer shows to the satisfaction of the court that the act or omission giving rise to [the violation] was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA].'"  Id. (citing 29 U.S.C. § 260).  "Determining whether an employer exercised good faith or had reasonable grounds for his belief that he was not in violation of the FLSA is an objective inquiry."  29 C.F.R. § 790.22(c).  Further, good faith "requires more than ignorance of the prevailing law or uncertainty about its development. It requires that an employer first take active steps to ascertain the dictates of the FLSA and then move to comply with them."  Sanchez Careera, 402 F. Supp. 3d at 149 (citing Lockwood v. Prince George's Cty., 58 F. Supp. 2d 651, 658 (D. Md. 1999) (internal quotation marks omitted).

In this case, there is a factual dispute as to whether defendants acted in good faith or had reasonable grounds for believing they were not in violation of the FLSA when they misclassified plaintiffs as independent contractors.  Defendants, for example, point to the deposition of Mr. Kuti, who testified that he obtained advice from a lawyer (ECF No. 75-19 at 14-15), consulted state officials (id. at 11-12), and conducted research on the industry standard, including the practices of other residential service agencies (id. at 42-43) in classifying plaintiffs as independent contractors. Plaintiffs, however, argue that defendants' assertions are post hoc justifications that fail to meet defendants' substantial burden of establishing good faith.  (ECF No. 77 at 22).  While it is far from clear whether defendants will be able to sustain their burden of proving good faith at trial, the court

concludes that an issue of material fact exists with respect to whether defendants acted in good faith or had reasonable grounds for believing they were not in violation of the FLSA when they misclassified plaintiffs as independent contractors. Accordingly, plaintiffs' Motion is denied, and defendants' Cross Motion is denied on this issue.

### D.  Treble Damages

In addition, plaintiffs argue that they are entitled to treble damages pursuant to the MWPCL. (ECF No. 70-1 at 28-29). Defendants, however, assert that there is no basis to award treble damages because there is a bona fide dispute as to why overtime and travel time wages were withheld. (ECF No. 75-1 at 28-29). An employee whose wages are withheld by an employer in violation of the MWPCL and "not as a result of a bona fide dispute" may be awarded treble damages. Md. Code Ann., Lab. & Empl. § 3-507.2(b). A bona fide dispute exists when "the party resisting the claim 'has a good faith basis for doing so.'" Hausfeld v. Love Funding Corp., 131 F. Supp. 3d 443, 465 (D. Md. 2015) (quoting Admiral Mortg. v. Cooper, 357 Md. 533, 542, 745 A.2d 1026, 1031 (2000)). "The existence of a bona fide dispute is a fact-based inquiry best left for resolution by the jury." Id. (citing Baltimore Harbor Charters, Ltd. v. Ayd, 365 Md. 366, 396, 780 A.2d 303, 320-21 (2001)). At the summary judgment stage, therefore, the question to be resolved is whether there is sufficient evidence to permit a trier of fact to determine whether defendants did not act in good faith when they misclassified plaintiffs as independent contractors and failed to pay them the required wages. Id. at 466. In this case, based on the court's discussion above that a factual dispute exists regarding liquidated damages and whether defendants acted in good faith in misclassifying plaintiffs as independent contractors and failing to pay plaintiffs' required wages, the court similarly concludes with respect to treble damages that summary judgment is not

appropriate.  Accordingly, plaintiffs' Motion is denied, and defendants' Cross Motion is denied on this issue.

### E.  Terminations of Plaintiffs Holden and Williams

Next, plaintiffs argue that defendants violated the FLSA's anti-retaliation provision by terminating Ms. Holden and Ms. Williams because of their involvement with this suit.  (ECF No. 70-1 at 29-31).  Defendants contend that Ms. Holden was suspended, not terminated, because she caused "disruption" of defendants' business.  (ECF No. 75-1 at 26-28).  Defendants also contend that Ms. Williams was suspended, not terminated, because she was "a disgruntled employee" who "harass[ed] and disrespect[ed] the administrators, using vulgar/abusive language towards them." (Id.)  The FLSA's anti-retaliation provision provides that it is unlawful for any person "to discharge or in any manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under [the FLSA] . . . ." 29 U.S.C. § 215(a)(3).  The court applies the McDonnell Douglas framework to retaliation claims.  Mould v. NJG Food Serv. Inc., 37 F. Supp. 3d 762, 778 (D. Md. 2014) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)).  Pursuant to the McDonnell Douglas framework, a plaintiff must first make a prima facie case of retaliation by showing that (1) he engaged in activity protected by the FLSA, (2) he suffered adverse action by the employer subsequent to such protected activity, and (3) a causal connection exists between the employee's activity and the employer's adverse action.  Id. (citing Darveau v. Detecon, Inc., 515 F.3d 334, 340 (4th Cir. 2008)).  If the plaintiff makes a prima facie case of retaliation, "the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse action."  Id. at 779 (citing Anderson v. G.D.C., Inc., 281 F.3d 452, 458 (4th Cir. 2002)).  If the defendant does so, the burden shifts back to the plaintiff "to

show that the proffered reason was not the employer's true reason but, rather, was merely a pretext for unlawful retaliation." Id.

Plaintiffs here argue that Ms. Holden established a prima facie case of retaliation because (1) she engaged in protected activity by filing this lawsuit, (2) she suffered adverse action by defendants when Mr. Kuti effectively terminated Ms. Holden on July 5, 2019 and (3) defendants admitted that they terminated Ms. Holden because she was dissatisfied with defendants' pay practices and was a saboteur.[10]  (ECF No. 70-1 at 30).  Given the close temporal proximity between the filing of plaintiffs' Complaint in March 2019 and Ms. Holden's termination less than four months later, in addition to defendants' clear intent of retaliation in defendants' termination letter evidenced by Mr. Kuti's references to Ms. Holden's dissatisfaction with her pay structure and Bwell's policy of not paying overtime (ECF No. 11-3 at 5), the court concludes that Ms. Holden has established a prima facie case of retaliation.  See Mould, 37 F. Supp. 3d at 778-79 (holding that the plaintiff established a prima facie case of retaliation when the plaintiff was terminated less than two months after his complaint against the defendant); see also Carter v. Ball, 33 F.3d 450, 460 (4th Cir. 1994) (noting that the court in an earlier case held that a causal connection existed when the plaintiff was fired approximately four months after filing a complaint).

In response to plaintiffs' arguments, defendants contend that Ms. Holden was suspended because "she was going to Bwell's office causing disruption of Bwell's operation during the working hours."  (ECF No. 75-1 at 26-27).  Defendants, however, provide no evidence of Ms. Holden's disruption other than Mr. Kuti's conclusory post hoc affidavit.  (ECF No. 75-21 at ¶ 9).

---

[10] Defendants argue that Ms. Holden was suspended, not terminated.  (ECF No. 75-1 at 26). Defendants' letter to Ms. Holden, however, clearly indicates that Mr. Kuti intended to terminate Ms. Holden.  For example, the letter notes that defendants "initiated efforts . . . to terminate our relationship with [Ms. Holden]" and expresses "gratitude" for Ms. Holden's service while she was with Bwell.  (ECF No. 11-3 at 5).

Further, defendants' termination letter to Ms. Holden does not assert that Ms. Holden caused disruption of Bwell's business during the working hours, as defendants now claim.  (ECF No. 11-3).  Instead, the letter notes that Ms. Holden was not satisfied with her pay structure, emphasizes that the "State does not pay overtime for its programs, and in turn, [Bwell] does not pay overtime," and refers to Ms. Holden as "a disgruntled and dissatisfied employee with tendencies to be a saboteur."  (Id.) (emphasis removed).  While defendants attempted to clarify in their pleadings that Mr. Kuti meant "destruction, damage and interruption of the business" when he referred to Ms. Holden as a "saboteur" (ECF No. 75-1 at 27), the face of Ms. Holden's termination letter, as discussed above, clearly indicates that Mr. Kuti was terminating Ms. Holden for her participation in this suit.  Further, even if the court were to accept Mr. Kuti's post hoc rationalization for Ms. Holden's termination as a legitimate, non-retaliatory reason for the adverse action, there is sufficient evidence in the record indicating that Mr. Kuti's reason was pretextual.  When asked on direct examination during a hearing on plaintiffs' Moton for Preliminary Injunction why he did not want to retain Ms. Holden if she was a decent worker, Mr. Kuti responded that "[t]he problem with it was they are dissatisfied with the compensation structure attached to their program that they participate in.  That is Ms. Pamela Holden." (ECF No. 26 at 108).  The court, therefore, concludes that no reasonable jury could conclude that defendants successfully articulated a legitimate, non-retaliatory reason for their termination of Ms. Holden.  Accordingly, plaintiffs' Motion is granted, and defendants' Cross Motion is denied on the question of whether defendants violated the FLSA's anti-retaliation provision when they terminated Ms. Holden.

With respect to Ms. Williams, plaintiffs assert that although she was not a plaintiff at the time of her termination, she was terminated because she is Ms. Holden's sister and in retaliation

for Ms. Holden's participation in this suit.[11]  (ECF No. 70-1 at 31).  Defendants, however, argue that Ms. Williams was suspended because "she was a disgruntled employee with [sic] poor attitude, who constantly harass[ed] and disrespect[ed] the administrators, using vulgar/abusive language towards them."[12]  (ECF No. 75-1 at 27).  Although this court has not addressed specifically whether a plaintiff may bring a FLSA retaliation claim based on the protected activity of a third party, other courts have determined that the FLSA should be construed to permit such retaliation claims.  See Ehmann v. Oshkosh Corp., No. 19-C-1128, 2019 WL 6173671, at *3 (E.D. Wis. Nov. 20, 2019) (holding that the plaintiff could assert a retaliation claim under the FLSA when she was fired after her husband engaged in protected activity under the FLSA); see also O'Donnell v. America At Home Health Care & Nursing Servs. Ltd., No. 12-C-6762, 2013 WL 1686972, at *3 (N.D. Ill. Apr. 18, 2013) (permitting the same).

In this case, although Ms. Williams was not a party to the suit at the time of the filing of plaintiffs' Complaint on March 12, 2019, she may assert her own retaliation claim against defendants given her relationship to Ms. Holden, who engaged in protected activity when the Complaint was filed.  (ECF No. 1).  Contrary to plaintiffs' position, however, there is evidence in the record from which a reasonable jury could find that defendants articulated a legitimate, non-retaliatory reason for Ms. Williams' termination.  Specifically, Ms. Williams' termination letter

---

[11] Defendants argue that Mr. Kuti did not know that Ms. Williams was related to Ms. Holden until Ms. Williams joined the lawsuit.  (ECF No. 75-1 at 27).  As plaintiffs note, however, defendants' assertion is contradicted by the record.  For example, in the context of the termination of Ms. Williams on July 9, 2019, defendants admitted in their Amended Answer that Mr. Kuti was "aware that Ms. Holden and Ms. Williams were sisters."  (ECF No. 52 at 4).  Ms. Holden also testified during her deposition that she referred Ms. Williams to Mr. Kuti as a prospective employee in December 2016 and told Mr. Kuti at the time that they were sisters.  (ECF No. 70-8 at 108-09).

[12] Defendants contend that Ms. Williams was suspended, not terminated.  (ECF No. 75-1 at 27).  Defendants' letter to Ms. Williams, however, notes that Ms. Williams is "no longer assigned to provide direct care services" and "keeping a working relationship with [Ms. Williams] is counter-productive."  (ECF No. 11-4 at 5).

notes that Ms. Williams "harass[ed] and disrespect[ed]" Bwell's administrators and used "vulgar/abusive language towards them." (ECF No. 11-4 at 5). In addition, Mr. Kuti testified during his deposition that he fired Ms. Williams based on negative reports from defendants' administrators who attested to Ms. Williams' harassment of them in the office. (ECF No. 75-19 at 79). There is also evidence in the record, however, that defendants' justifications for Ms. Williams' termination were pretextual. For example, as plaintiffs note, Mr. Kuti previously testified that the problem with Ms. Williams on his payroll was that she was "dissatisfied with the compensation structure." (ECF No. 26 at 64). Plaintiffs also point to testimony by one of defendants' former administrators suggesting that Ms. Williams did not actually harass Bwell's administrators and, instead, would simply come into the office and say that she was not paid overtime and that she would tell her lawyer. (Id. at 49-50). Based on the foregoing evidence, there is clearly a factual dispute as to whether defendants articulated a legitimate, non-retaliatory reason for Ms. Williams' termination. Accordingly, plaintiffs' Motion is denied, and defendants' Cross Motion is denied on the question of whether defendants violated the FLSA's anti-retaliation provision when they terminated Ms. Williams.

### F.   Status of Defendant F. Kuti Under the FLSA

Finally, plaintiffs argue that Mr. Kuti is liable as plaintiffs' employer. (ECF No. 70-1 at 31-34). Defendants' only argument on this point is that Mr. Kuti was not plaintiffs' employer because the FLSA does not apply to plaintiffs. (ECF No. 75-1 at 25). An employer under the FLSA "includes any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). This court applies the "economic reality test" to determine whether an individual qualifies as an employer under the FLSA, MWHL, and MWPCL. Gaske, et al. v. Crabcake Factory Seafood House, LLC, et al., No. 18-2630-JMC, 2021 WL 5326465, at

*2 (D. Md. Nov. 15, 2021).  In applying the "economic reality test," the court considers whether the putative employer "(1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records."  Kerr v. Marshall Univ. Board of Governors, 824 F.3d 62, 83 (4th Cir. 2016).  No single factor is dispositive.  Id.  The plaintiff bears the burden of proving whether the defendant is an employer.  Gaske, 2021 WL 5326465, at *2.

In this case, there is significant evidence in the record indicating that Mr. Kuti was plaintiffs' employer.  As plaintiffs note, Mr. Kuti, as the owner of 99 percent of Bwell, formulated Bwell's policies, managed daily operations, developed job descriptions, maintained plaintiffs' performance records, fixed plaintiffs' rate of pay, processed their paychecks, and hired and fired workers.  (ECF No. 70-1 at 33).  Mr. Kuti also made the decision to classify plaintiffs as independent contractors.  (Id. at 33-34).  Defendants provide no evidence refuting plaintiffs' arguments except to say that Mr. Kuti is not an employer under the FLSA because the FLSA does not apply to plaintiffs.  (ECF No. 75-1 at 25).  In light of the court's analysis above concluding that plaintiffs were employees under the FLSA, however, defendants' argument is unpersuasive. Based on the evidence in this case, there is no factual dispute that Mr. Kuti was plaintiffs' employer.  Accordingly, plaintiffs' Motion is granted, and defendants' Cross Motion is denied on this issue.

## IV.  **CONCLUSION**

For the reasons discussed herein, plaintiffs' Motion for Partial Summary Judgment (ECF No. 70) is granted in part and denied in part, and defendants' Cross Motion for Summary Judgment (ECF No. 75) is denied.  Specifically, plaintiffs' Motion for Partial Summary Judgment (ECF No. 70) is granted as follows: (1) plaintiffs were employees of defendants under the FLSA, MWHL,

24

and MWPCL; (2) defendants violated the FLSA's anti-retaliation provision by terminating Ms. Holden; (3) and Mr. Kuti was plaintiffs' employer under the FLSA.  Plaintiffs' Motion for Partial Summary Judgment (ECF No. 70) is DENIED as to all other issues and defendants' Cross Motion for Summary Judgment (ECF No. 75) is DENIED as to all issues.  A separate order will be issued.


December 7, 2021                                         /s/
                                              Beth P. Gesner
                                              Chief United States Magistrate Judge